(113 So. 760)

No. 26424.

## HARDIN v. FEDERAL RICE MILL CO., Inc.

May 23, 1927. Rehearing Denied July 11, 1927.

*(Syllabus by Editorial Staff.)*

1. Carriers ☜▬195—Consignor's primary liability to pay freight, if present, ceases when freight is paid by another.

Primary liability of consignor, or owner, of rice for freight charges, if present, ceases, and provisions of law are satisfied, when freight is paid by another.

2. Sales ☜▬222—Seller of rice held not liable for freight paid by forwarding agent when buyer was unable to pay, in view of contract.

Seller of rice acting under contract providing that after delivery at point of shipment "all freight charges, demurrage and expenses or risks" were for account of purchaser *held* not liable to freight broker and forwarding agent who paid freight when buyer of rice, who expected to reship it, was unable to pay.

Appeal from Eighteenth Judicial District Court, Parish of Acadia; William Campbell, Judge.

Action by Jefferson D. Hardin, Jr., against the Federal Rice Mill Company, Inc. Judgment for defendant, and plaintiff appeals. Affirmed.

Lemle, Moreno & Lemle, of New Orleans, for appellant.

W. J. Carmouche, of Crowley, for appellee.

ROGERS, J. Alleging that the defendant company was legally liable therefor, plaintiff brought this suit to recover the amount of certain freight charges and war taxes paid by him as an alleged guarantor to the carrier on a certain lot of rice transported from Crowley, La., to the city of New Orleans. The court below rejected his demand, and this appeal followed.

In the month of November, 1920, P. N. Gray & Co., of the city of New York, wired plaintiff, a freight broker and forwarding agent of the city of New Orleans, to obtain a price on 1,500 tons (approximately 30,000 pockets) of rice delivered at shipside in New Orleans. Plaintiff referred the inquiry to Welisch & Co., rice brokers, who, in due time, effected a sale of the required quantity and quality of rice between the inquirers and the National Rice Company, Inc., of New Orleans. The agreed price was $3.50 a pocket f. a. s. (free at shipside), which it was provided was to be paid by the Hibernia Bank & Trust Company, of New Orleans, under a letter of credit to be established with said institution, on the presentation to it of the invoices, with attached certificates showing the proper grade, and ocean bills of lading or mate's receipts showing delivery to the ship. The National Rice Company, Inc., in turn, purchased the rice from the Iota Rice Mill Company, Inc., of Iota, La., and the Federal Rice Mill Company, Inc., of Crowley, La., delivered f. o. b., Crowley, La., or Iota, La. The price of the rice as fixed in this agreement was $3.05 a pocket, based on a 19-cent freight rate to Algiers (the section of New Orleans lying on the west side of the Mississippi river), with a guaranty of delivery to that point not later than December 7, 1920. It was specifically stipulated in the agreement of sale that:

All shipments made f. o. b. shipping point. Seller agrees to deliver the goods free to transportation company at point of shipment in good

shipping condition in exchange for transportation company's bill of lading. All freight charges, demurrage and expenses, or risks that may occur thereafter are for account of buyer."

The rice was shipped by the defendant company to its own order, with "destination New Orleans, La., notify the National Rice Company, New Orleans, La." The defendant company then drew its drafts on the National Rice Company, Inc., for the amount of the invoices, annexed thereto the bills of lading properly indorsed, and sent them to various banks in the city of New Orleans for collection. The rice was invoiced to the purchaser at $2.86 per hundred pounds, being the sale price, less 19 cents per hundred pounds freight thereon from Crowley to New Orleans.

The National Rice Company, Inc., paid some of the drafts and obtained the bills of lading thereto attached, but failed to pay others, among which were those covering 23 cars of rice for the payment of the freight and war charges on which plaintiff is seeking reimbursement in this suit.

The exact amount of rice involved in the transaction was 31,780 bags. It was purchased by Gray & Company from the National Rice Co., Inc., with a view of transporting it from New Orleans to Europe. In furtherance of this object, the said purchasers arranged with the Kerr Steamship Company for the necessary transportation. The contract of affreightment was actually made in New York through Douglas & Co., freight brokers, for whom plaintiff was the representative in New Orleans, and the steamship Phœnix Bridge was assigned by the steamship company to transport the rice. It appears that the cargo was to be placed aboard ship at the Stuyvesant docks, at New Orleans, where it was brought by the Illinois Central Railroad Company after that company had received it from the New Orleans, Texas & Mexico Railroad, which had brought it from shipping points to New Orleans, its destination as set forth in the bills of lading.

While the vessel was lying at the dock, under heavy demurrage charges, and after the entire shipment had reached New Orleans, it developed that a considerable portion of the rice could not be delivered to the ship because of the inability of the National Rice Company, Inc., to pay the drafts and thereby obtain the accompanying bills of lading to surrender to the carrier for the rice. When this difficulty arose, plaintiff, a Mr. Keiffer, and a Mr. Aicklen held a conference with a view of finding a way out. Plaintiff was interested in seeing the shipment go forward, if not on behalf of Gray & Co., certainly as the representative of their principals, Douglas & Co. Mr. Aicklen was interested as the broker who had made the sale from the defendant company to the National Rice Company, Inc., and Mr. Keiffer was the president of the latter company.

Subsequently to this confidence, and apparently as a result thereof, the defendant company, by wire and by letter, authorized the various banks holding their drafts for collection to deliver to the plaintiff on trust receipts the bills of lading covering the 23 cars of rice referred to in his petition herein. This was done. Plaintiff then surrendered the bills of lading to the railroad company, with instructions to deliver the rice to the steamship Phœnix Bridge at Stuyvesant docks. This was also done. The railroad company did not exact payment of the freight charges and war taxes at the time of delivery to the steamship, because plaintiff as a forwarding agent enjoyed the privilege of a "credit list" with it, under which he was responsible for said charges. Plaintiff himself did not at that time require or demand either of the National Rice Company or of the defendant company that it should pay the charges, and he took no measures whatsoever to protect him-

self on his liability therefor to the railroad company.

After the rice was delivered to the dock, 21,499 pockets were examined by the inspectors of the Board of Trade and found to be below the grade purchased. The resultant dispute was settled by an arbitration wherein it was determined that a reduction of 50 cents per one hundred pounds should be made on the contract price. Certificates of the Board of Trade were then issued to cover this rice which was placed on board the steamship, together with the remaining 10,281 pockets which were not covered by certificates. This uncertified rice on reaching Hamburg was also found to be below grade, and was sold at a reduced price. The matter was further complicated by the claim of the owners of the steamship for $28,500 as demurrage, and $8,788.46 for freight and insurance charges on the 10,281 pockets of uncertified rice. There were some moneys due, also, to certain banks. In order to settle their differences and to bring about the adjustment of the demands of the various claimants, the National Rice Company, Inc., and the defendant company (including the Iota Rice Mill which had sold some of the rice) entered into certain written agreements under which the transaction was handled and the funds distributed. The final distribution took place on May 5, 1921. Plaintiff was not a party to these agreements.

As appears from a letter in the record signed by the local attorneys of the Illinois Central Railroad Company, the freight charges and war taxes in question were paid by the plaintiff on March 4, 1922, which was many months after the rice had been delivered to the steamship. The railroad company, however, had promptly presented the freight bills to plaintiff, who endeavored to have the National Rice Company, Inc., pay them. He was unsuccessful in this endeavor, as will appear from his telegram of January 5, 1921, addressed to the defendant company reading:

"National Rice Mill here unable to pay freight rice shipped them Phœnix Bridge. Railroad now holding us. Wire your wishes."

Upon receipt of this telegram the defendant company wired plaintiff that its Mr. Coleman was in New Orleans and to take up the matter with him. This was not done by plaintiff. On the contrary, he was in daily communication with the National Rice Company with a view of having that company make an immediate settlement of the freight charges, as is shown by his letter of January 15, 1921, to the agent of the railroad company. It is true that in this letter he states that he was advised on that day (January 15, 1921) by the National Rice Company that the charges would be remitted to the carrier by the defendant company. The statement of the National Rice Company, however, could not bind the defendant company. More than two weeks thereafter, plaintiff addressed another letter to the railroad company, when, for the first time, he attempted to connect the defendant company with the matter by stating that he had been "merely acting as forwarding agent for the Federal Rice Mill and the National Rice Company, and the freight charges on this lot of rice we understood had been prepaid by the shippers." He stated, also, that the freight was due "by either the Federal Mill as shipper, or the National Rice Company as receiver." This letter, again, is not binding on the defendant company. One month later (March 4, 1921) plaintiff wrote the defendant company about these freight charges and complaining that he had not received any word in regard to their payment. This letter contains this significant statement, viz.:

"We were of the *opinion* at the time the shipments were handled that they were fully prepaid, and that *if the charges were not paid you would protect us in the matter.*" (Our italics.)

This shows clearly that the defendant company had not obligated itself to reimburse plaintiff for the freight charges, and that

plaintiff so understood. On April 9, 1921, plaintiff wrote Mr. M. M. Lemann, of Monroe & Lemann, who handled the arbitration, in which he says that the freight charges were due "by either the Federal Rice Mill or the National Rice Company," and asked him to advise him to whom the railroad company should look for payment. The answer to this letter was not offered in evidence, and there is nothing to show what advice was given to plaintiff by Mr. Lemann. The matter rested here so far as the defendant is concerned until October 13, 1921, when plaintiff addressed it another letter in which he stated that he had handled the rice for "the joint account of yourself and the National Rice Company, * · * * in which it was agreed that you would arrange to pay us for the services rendered as· forwarding agents in connection with this shipment." He stated that he had been patiently waiting for a check which he had not received, and expressed the hope that it would be sent by return mail. This letter evoked the prompt denial by the defendant of the arrangement referred to therein. On March 19, 1921, the defendant company wrote plaintiff in reference to a telegram and letters of a recent date, clearly repudiating any liability in the matter, and suggesting that it rightfully belonged to plaintiff and the National Rice Company.

It is clear from the exhibits offered in evidence, to which we have referred, as well as from the testimony of the witnesses, which we have carefully read, that the rice was not sold by the defendant company "free at shipside"; that plaintiff was never employed by the defendant company to act, and did not act, as its forwarding agent in connection with the shipment; that plaintiff at no time made any·claim upon the defendant company for the reimbursement of the freight charges until after the National Rice Company failed or was in failing circumstances; and that the defendant company never, through any of its officers or authorized agents, agreed·to make such reimbursement.

[1, 2] Nor do we find any force in the contention that since the defendant company as the consignor, or owner, of the rice was responsible for the freight charges it is, therefore, liable to plaintiff as the subrogee of the carrier.

It is true that under the provisions of the Interstate Commerce Act (U. S. Comp. St. § 8563 et seq.) it is the mandatory duty of the carriers to collect from shippers freight charges based on the rates filed and published with the Interstate Commerce Commission, but these provisions were enacted in pursuance of a sound public policy to prevent discrimination between shippers. Conceding that the defendant company, as consignor or owner of the rice, was primarily liable for the carrier for the freight charges, the liability ceased, and the provisions of the law were satisfied, when the freight was paid. As a matter of fact, however, under the agreement of sale between the National Rice Company and the defendant company, after the delivery of goods to the carrier at the point of shipment, "all freight charges, demurrage and expenses, or risks" that might occur were for account of the purchaser.

Plaintiff was neither the surety nor the codebtor of the defendant company for the payment of the freight charges. His obligation arose from the special contract entered into between himself and the railroad company wherein quoad that company he became its principal debtor for .the debt. After the goods were released by the carrier, it looked only to plaintiff for the payment of its freight. Plaintiff did not pay the charges at the special instance of the defendant company, nor did that company assume any liability therefor. If plaintiff was not a volunteer in the transaction, which is not probable, his interest therein as forwarding agent was not on behalf of the defendant company, but on be-

half of the National Rice Company and other parties to the transaction.

Plaintiff's loss is regrettable. It is due, however, solely to his own fault, since it is undeniable that if he had taken the proper steps at the proper time he could have protected himself against it. On the other hand, the defendant company was a heavy loser by the transaction. We do not find any sanction either in law or in equity to add to its misfortune by imposing upon it the additional burden of plaintiff's loss.

For the reasons assigned, the judgment appealed from is affirmed at appellant's cost.